**PRIMECO PERSONAL COMMUNICATIONS, L.P., Plaintiff,**

v.

**VILLAGE OF FOX LAKE, Defendant.**

**No. 97 C 8023.**

United States District Court, N.D. Illinois, Eastern Division.

March 12, 1999.

Donald Joseph Vogel, Sara Lynne Thomas, Adam Carl Smedstad, Michael, Best & Friedrich, Chicago, IL, for Imeco Personal Communications, L.P., a Delaware limited partnership, plaintiff.

Paul P. Phillips, Howard R. Teegen, Soffietti, Johnson, Teegen, Phillips & Schwartz, Ltd., Fox Lake, IL, for Village of Fox Lake, an Illinois municipal corporation, defendant.

Donald Joseph Vogel, Sara Lynne Thomas, Adam Carl Smedstad, Michael, Best & Friedrich, Chicago, IL, for Plaintiff.

Paul P. Phillips, Howard R. Teegen, Soffietti, Johnson, Teegen, Phillips & Schwartz, Ltd., Fox Lake, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

In an earlier opinion, *PrimeCo Personal Communications, L.P. v. Village of Fox Lake*, 26 F.Supp.2d 1052 (N.D.Ill.1998) (*"PrimeCo I"*), this Court held that the Village's decision denying PrimeCo's application for a special use permit violated the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7)(B)(iii). We remanded the case to the local zoning authority, instructing it to either grant PrimeCo's permit application or conduct an expedited hearing in conformity with our opinion. The Village Trustees chose the latter option, conducted a supplemental hearing, and again denied the application. The case is now before us on PrimeCo's motion seeking reconsideration of our decision to remand the case for further proceedings and attacking the Village's second denial of its permit application. We deny PrimeCo's motion on both counts: under the specific circumstances of this case, denying PrimeCo's request for injunctive relief was

proper; and substantial evidence in the record supports the Village's decision to deny PrimeCo's application.

### PrimeCo's Motion to Reconsider this Court's Denial of Injunctive Relief

■ In *PrimeCo I*, we decided the merits of the case in favor of PrimeCo, but refused the relief it sought: an injunction ordering the Village to issue the special use permit. *PrimeCo I*, 26 F.Supp.2d at 1066. Instead, we remanded the case to the local zoning authority for an appropriate decision under the Act. On December 7, 1998, PrimeCo filed a motion challenging our denial of its request for injunctive relief.[1] We deny PrimeCo's request to reconsider that decision.

As explained in *PrimeCo I*, the Telecommunications Act does not specify a remedy for the violation of § 332(c)(7)(B)(iii); instead it grants federal courts jurisdiction to hear a very narrow subset of challenges to local zoning decisions and explicitly reserves local zoning authority "over decisions regarding the placement, construction, and modification of personal wireless service facilities." § 332(c)(7)(A); *see also* § 332(c)(7)(B)(v) (granting federal courts subject matter jurisdiction and simply instructing the courts to "hear and decide such action[s]."). Congress clearly intended that local zoning authorities would retain their traditional role in deciding special use application with very few, very specific limitations (e.g., local authorities may not deny cellular tower permits on the basis of perceived health risks, § 332(c)(7)(B)(iv)).

In this case, the Village Board, grappling with a new law startling in its departure from traditional notions of local authority over zoning decisions, had no consistent guidance on its application, and no experience with federal agency procedures or even language. *PrimeCo I*, 26 F.Supp.2d at 1059–61

(discussing competing interpretations of § 332(c)(7)(B)(iii)). Even now there is little agreement among the courts as to the meaning of substantial evidence under § 332(c)(7)(B)(iii). *Compare, e.g., Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 495–96 (2d Cir.1999) (residents' unsupported expressions of concern over the aesthetics and financial impact of cellular towers probably is insufficient under the Act), *with AT & T Wireless PCS, Inc. v. City Council of Virginia Beach*, 155 F.3d 423, 430 (4th Cir. 1998) (constituents' unsupported statements opposing location of cellular tower constitutes substantial evidence).[2] We continue to believe that granting PrimeCo's request for an injunction under these specific circumstances would have been unfair to the Village, and upsetting to the balance intended by Congress when it reserved zoning authority to municipalities. Furthermore, as feeble as the original hearing records were in terms of evidence, it was clear that local residents voiced legitimate concerns about the monopole's proposed location that fit comfortably within the framework of the local zoning ordinance.

But, having said all this, we do not expect local zoning authorities to rely on this opinion as an excuse to delay cellular tower permit proceedings by purposefully conducting shoddy hearings and then, once challenged in court, requesting a second opportunity to do it correctly. Obviously, such an illogical and expensive strategy would not be condoned by any court. Additionally, the standards are becoming clearer with each federal court decision interpreting the Act, and we fully expect guidance from the Seventh Circuit on the proper interpretation of § 332(c), averting future claims of ignorance by municipalities.

Since our earlier opinion, the Second Circuit has held that the appropriate relief for

---

1. We deferred ruling on PrimeCo's December 7 motion because, on the one hand, if the Village granted PrimeCo's application the motion would be moot and, on the other hand, if the application was again denied we anticipated the presentation of other claims by PrimeCo. In any event, our strict time constraint on the Village meant that the delay in deciding the motion would be minimal; and it was—PrimeCo filed its comprehensive brief on February 10, 1999.

2. We recognize that, should the Seventh Circuit adopt the standard for evaluating constituent testimony articulated in *Virginia Beach*, the outcome of *PrimeCo I* would have been different: the Village would have been entitled to summary judgment.

a violation of § 332(c)(7)(iii) is an order commanding issuance of the requested permit. *Oyster Bay*, 166 F.3d 490, 496–97. In discussing the appropriate remedy, the *Oyster Bay* panel first noted that the majority of courts automatically enter injunctions upon finding violations of the Act, and that only two courts—this one and the United States District Court for the Middle District of Florida—remanded a case for further proceedings. *Id.* at 496 (citing cases); *see also AT & T Wireless Serv. of Fla., Inc. v. Orange County*, 982 F.Supp. 856 (M.D.Fla. 1997).[3] It then cited the "TCA's stated goal of expediting resolution of this type of action," and summarily found that remand would serve no useful purpose. *Oyster Bay*, 166 F.3d 490, 496. Of course, this case is distinguishable from *Oyster Bay* on that last point, and we believe the strict time limitation imposed by our earlier decision, especially when coupled with our expedited treatment of this litigation, adequately incorporated Congress' concerns regarding timeliness.[4] In sum, we believe that in exercising our discretion to remand the case on an expedited basis, we appropriately balanced and accommodated the various competing interests and goals recognized by the Act.

For these reasons, we deny PrimeCo's request to revisit our decision denying injunctive relief and remanding the case for further proceedings. Having resolved that question, we turn to the substantive issues regarding the Village's second denial of PrimeCo's permit application.

### Facts[5]

On January 13, 1999, the Village Board of Trustees and the Village Zoning Board of Appeals conducted a joint supplemental hearing on PrimeCo's application for a special use permit allowing PrimeCo to construct a 150-foot monopole on property located at the juncture of U.S. Route 12 and Illinois Route 59 ("the Hellios site"). A written decision denying PrimeCo's application was prepared and, on January 18, 1999, adopted by the Board. (PrimeCo Br. Att. 1, Decision of Village of Fox Lake Board of Trustees Denying Special Use Permit Application of Michael Hellios and PrimeCo Communications ("Decision").)

In its decision, the Board stated several reasons for denying PrimeCo's application. Specifically, the Village reasoned that a monopole on the Hellios site would negatively impact economic development of the community by discouraging quality development in the area; injure the use and enjoyment of the 36 property owners who would have a clear view of the structure from their property; and "diminish the unique ... character of the heavily wooded hill generally regarded as the gateway ... to the Village." (Decision at 1–2.) Therefore, the Village concluded, PrimeCo did not satisfy the criteria of local zoning ordinance sections 9–1–6–10D.1 (the intended use will not be detrimental to the general welfare of Fox Lake residents) and 9–1–6–10D.2 (the intended use will not injure the use and enjoyment of property by Fox Lake residents). Additionally, the Village found that alternative sites for the monopole exist at more aesthetically appropriate locations. Finally, the Village concluded that PrimeCo did not establish the technological necessity of the Hellios site, but merely demonstrated that the site would be economically advantageous to PrimeCo. A description of the relevant evidence adduced at the supplemental hearing follows.

The first witness was Pete Pointer, an architect and certified urban planner with 37 years of experience who, for the past 17 years, has operated his own planning and design firm. (Tr. of Jan. 13, 1999 Hr'g, at 12–13 ("Tr.").) Pointer opined that placing

3. Although we were not aware of the *Orange County* decision when we decided *PrimeCo I*, we are gratified to know another federal judge reasons as we do.

4. We decided *PrimeCo I* just 19 days after PrimeCo filed its reply brief. Additionally, on remand we ordered the Village to act within 60 days. Now we decide PrimeCo's motion within 14 days of final briefing, which was also expedited. In contrast, PrimeCo, now arguing that time is of the essence, waited almost ten months to file a motion for summary judgment (which involved purely legal issues and a virtually non-existent administrative record).

5. We assume familiarity with our earlier opinion and do not iterate the facts recited there that are not relevant to this opinion.

the monopole at the Hellios site would negatively impact the community by discouraging residential and resort development and impairing the owners' enjoyment of existing residential property. (Tr. at 25.) In reaching these conclusions, Pointer relied on the "unique topography" of the Hellios site and the result of a balloon test.

As to topography, Pointer describes the Hellios site as the "gateway" to Fox Lake. The property is on a hill in the "V" where U.S. Route 12 splits from Illinois Route 59. (See Hr'g Ex. 1, Topographical Survey Map of Fox Lake.) To reach the resort district of Fox Lake one continues north on Route 12; several residential developments lie on Route 59 immediately north of the split. (See Hr'g Ex. 2, Aerial Photograph of Fox Lake.) South of the split the land is flatter and makes up Fox Lake's commercial corridor; for example, a Menard's and a Jewel are located south of the split at the intersection of Route 59 and Illinois Route 134. Additionally, a grammar school and middle school are located along the stretch of Route 59 just south of the split. The Hellios site is located on one of the highest hills in the area and, when seen from the south, has a forest backdrop.

Pointer explained the significance of preserving Fox Lake's gateway as follows:

> the gateway to a community and its character are very important to attracting commerce and industry. The economic objectives of improving the aesthetics of an entry and a gateway to a community are attested to by municipalities throughout the entire metropolitan region who are spending thousands or tens of thousands of dollars for signage, for landscaping, for special gateway treatments.

(Tr. at 16–17.) Although Pointer could not quantify the negative economic impact of locating the monopole on the Hellios site, he stated that "from [his] experience, the attractiveness of the entry to a community does influence people's [sic] opinion of it and that in turn affects where they patronize, where they invest, and so on." (Tr. at 44.)

Pointer used twelve pictures to illustrate the visual impact of a 150–foot monopole at the Hellios site. One picture shows an existing monopole in Wauconda, Illinois; another shows the Hellios site as it currently looks; and the rest of the pictures, taken during the balloon test conducted on January 9, 1999, show the visibility of a 150–foot structure on Hellios site from various locations in Fox Lake. Based on the photographs, Pointer testified that the proposed monopole would "extend close to a hundred feet above the tree line," (Tr. at 22), and would be clearly visible from approximately three dozen homes, (Tr. at 24). He also stated that property close to the Hellios site had "a commanding view over the lake and is a very attractive development site," but that "the value of the view" would be diminished by a monopole. (Tr. at 21.) For these reasons, Pointer concluded that building a monopole on the Hellios site would be inconsistent with the local zoning ordinance sections 9–1–6–10 D.1 and D.2.

PrimeCo called several witnesses testifying in support of the Hellios site. For purposes of this motion, we need discuss only two: Matt Nourse, a PrimeCo design engineer who designs, evaluates, and approves tower sites and specifies the type of equipment necessary to provide seamless service coverage, (Tr. at 89); and George Baker, an independent fee appraiser who testified about the impact a cellular tower would have on nearby property values, (Tr. at 159).

Nourse first explained that PrimeCo currently has a four-mile wide service gap in which PrimeCo customers cannot reliably make, receive, or continue phone calls. (Tr. at 90.) A tower must be constructed within a quarter-mile of the center of that gap, with enough height (i.e., 150 feet) to cover a two-mile radius. (Tr. at 90–91, 96, 99.) Nourse claimed that a 100–foot tower would reach only a one-mile radius, in which case more towers would be required to cover the gap. (Tr. at 90.) Additionally, he testified that lowering the height of a tower to 100 feet could cause trees to interfere with the "line of sight" between towers and, therefore, interfere with cellular service. (Tr. at 104.)

Several people at the hearing questioned Nourse about alternate sites. Nourse rejected out-of-hand building a tower at the local

Menard's, stating that it was "too far south." (Tr. at 112.) Similarly, Nourse rejected the idea of building two shorter towers, claiming that shorter towers would result in "line of sight" interference (Tr. at 112). However, later he testified that "line of sight" problems could be ameliorated by "down tilting," amplifiers, and "repeaters." (Tr. at 113–14.) Moreover, Nourse acknowledged that the coverage gap resulting from either alternative (i.e. one tower located south of the Hellios site or two towers located on some unidentified water towers) would be harmless because located over the lake and Volo Bog, an uninhabitable and roadless wasteland. (Tr. at 127–31.) Nourse also identified one other site as absolutely acceptable, noting, however, that a new water tower proposed for that site has yet to be built. (Tr. at 107–08.)

Baker, an independent fee appraiser with 21 years' experience in real estate appraisal, testified that a monopole at the Hellios site would "not result in a substantial minus of value to the surrounding properties." (Tr. at 165.) He based his opinion on discussions he had with a salesman for a residential development located near a PrimeCo monopole in Mundelein, Illinois, and various real estate brokers who sold property near that monopole. (Tr. at 163, 178.) The salesman told Baker that the Monopole was a "non-issue, [and] nobody really noticed it." (Tr. at 164.) Additionally, since the monopole was constructed the price of homes in the development rose from around $175,000 in mid–1996 to $200,000–$250,000 today. (Id.) Similarly, the brokers told Baker that the monopole had no affect on their ability to sell properties near the pole. (Tr. at 179.) In Baker's opinion, the proposed monopole would have a "neutral impact" on residents' enjoyment of their property. (Tr. at 179–80.)

PrimeCo presents four basic challenges to the Village's decision. First, PrimeCo asserts that the Village abandoned its previously stated reasons for rejecting the application, and used the hearing only to "rationalize its predetermined decision" to deny PrimeCo's request. (PrimeCo Br. at 1.) Next, PrimeCo claims that the decision was not supported by substantial evidence.

Third, PrimeCo contends that the Village's reasons for denying the permit application all boil down to aesthetics, an impermissible basis under Illinois law. Finally, PrimeCo argues that the Village was required to issue the permit because PrimeCo definitively established the technological necessity of the Hellios site. We address each argument in turn.

## I. Pretext

PrimeCo argues that the Village improperly abandoned the reasons it gave during earlier proceedings, and used the supplemental hearing to "create a pretextual basis to deny PrimeCo's [special use] application." (PrimeCo Br. at 1.) Initially, we note that PrimeCo's pretext argument is unacceptably vague. First, PrimeCo never reveals the "pretext" of which it complains, never reveals what it believes is the "real" reason for the denial. See Black's Law Dictionary 1187 (6th ed. 1990) ("Pretext. Ostensible reason or motive assigned or assumed as a color or cover for the real reason or motive."). Instead, the Village was bluntly honest about its reasons: local residents find monopoles ugly, they don't want one ruining their own views, and they are concerned that tourism and development will be stunted if PrimeCo constructs a monopole in the middle of one of the best views of the lake. PrimeCo does not provide an improper alternative to the reasons expressed by the Village.

Additionally, PrimeCo does not explain why it believes the Village has abandoned the aesthetic and economic concerns it relied upon during earlier proceedings before this Court. In PrimeCo I, the Village provided three reasons for rejecting PrimeCo's application: the negative visual impact of the proposed tower, PrimeCo's failure to explore alternate sites for the tower, and the lack of any benefit to the Village. Clearly, the Village has abandoned the lack-of-benefit argument; but the negative visual impact of a monopole at the Hellios site and a desire for a more visually appropriate, alternative location continue as the basis for the Village's denial of PrimeCo's application.

In any event, this attack on the Village's decision is unavailing. As stated above, the

Telecommunications Act provides a very narrow universe of prohibited reasons for denying a special use permit. Specifically, local zoning authorities may not (1) enact ordinances that unreasonably discriminate among providers of cellular services or have the effect of prohibiting the provision of wireless services, § 332(c)(7)(B)(i), and (2) deny a permit "on the basis of the environmental effects of radio frequency emissions," § 332(c)(7)(B)(iv). PrimeCo neither alleges, nor argues, nor cites even a hint of evidence that the Village violated these prohibitions. For these reasons, we reject PrimeCo's argument that the Village's conduct was somehow improperly pretextual.

## II. Substantial evidence

■ The Telecommunications Act requires substantial evidence supporting the denial of requests to construct wireless phone service facilities. 47 U.S.C. § 332(c)(7)(B)(iii). As stated in our earlier opinion, "substantial evidence" under § 332(c)(7)(B)(iii) is equivalent to "the traditional standard used for judicial review of agency decisions." H.R.Conf.Rep. No. 104–458, at 208.

As discussed in cases reviewing agency decisions, "substantial evidence is more than a scintilla of evidence but less that a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Geske & Sons, Inc. v. NLRB,* 103 F.3d 1366, 1374–75 (7th Cir.1997) (quotation and citations omitted). To determine whether substantial evidence exists, this Court must "review the entire record; however, we do not substitute our judgment for that of the [agency] by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility." *Brewer v. Chater,* 103 F.3d 1384, 1390 (7th Cir.1997) (citations omitted).

From our recitation of the evidence adduced at the supplemental hearing, it should be clear that substantial record evidence supports the Village's decision to deny Prime-

Co's application. Pointer's testimony supports both of the Village's major reasons for denying the permit: negative economic impact based on diminished future residential and resort development and decreased enjoyment by current owners of their property. Pointer, an expert in urban planning,[6] relied on his 37 years of experience and various photographs, primarily of the balloon test, which demonstrate the visual impact of the proposed 150–foot tower at the Hellios site. Although PrimeCo's expert, George Baker, disagreed with Pointer's assessment of the proposed tower's impact, the standard of review does not permit us to resolve this conflict anew. The Village chose to believe Pointer's assessment, as it was entitled to do. A reasonable mind could accept Pointer's testimony as sufficient to support the Village's conclusion that the proposed monopole could stunt development and injure residents' enjoyment of their property. We see no reason to disturb the Village's choice.

## III. Aesthetics and Illinois Law

■ In *PrimeCo I,* we addressed without deciding PrimeCo's argument that Illinois law prohibits the denial of special-use permits on the basis of aesthetics alone. 26 F.Supp.2d at 1064–65. Without citing any additional caselaw, PrimeCo now renews its contentions. Accepting for the moment PrimeCo's contention that aesthetic concerns alone are insufficient to deny its application, *see County of Lake v. First Nat'l Bank of Lake Forest,* 79 Ill.2d 221, 37 Ill.Dec. 589, 402 N.E.2d 591, 595 (1980) ("Aesthetic considerations, although not disregarded, are not controlling."), this contention does not establish any impropriety in the Village's decision. The Village's written decision explicitly links the negative visual impact of the proposed tower with criteria in the local ordinance. Specifically, the Village found that the ugliness of the tower would negatively impact economic development in the area and, therefore, would be detrimental to the general welfare of Fox Lake residents. *See* Village

**6.** On page five of its brief, PrimeCo states: "Indeed, the only evidence that was adduced in support of the Village's Denial amounted to lay testimony on generalized concerns of the aesthetic impact of the proposed monopole." If, by this

argument, PrimeCo attacks Pointer's status as an expert, such attack obviously must fail: Pointer has a long list of accomplishments and credentials. *(See* Tr. at 12–14.)

Ordinance 9–1–6–10D.1. Additionally, the Village found that the ugliness of the tower would be "injurious to the use and enjoyment of other property in the immediate vicinity." Village Ordinance 9–1–6–10D.2. Thus, the permit was not denied based solely on aesthetics, but because the negative aesthetic quality of the tower impacts interests legitimately considered under the Village Ordinance. The premise of PrimeCo's argument—that the Village denied its application purely for aesthetic reasons—is faulty and, for this reason, the argument is unavailing.

### IV. Necessity

■ Finally, PrimeCo argues that its evidence proved that the Hellios site was technologically necessary and, therefore, that the Village was obligated to issue the special-use permit. Having thoroughly reviewed the record, however, we believe the Village reasonably relied on evidence in the record to conclude that alternate sites exist. Specifically, Nourse conceded that the site of the proposed new water tower would provide adequate coverage, (Tr. at 107–08), that two or more shorter towers could provide adequate coverage, (Tr. at 96, 112), and that a tower located one-quarter mile south of the Hellios site could actually be more appropriate than the Hellios site, (Tr. at 100–01, 127–28; *see also* Hr'g Ex. 7 (showing that Hellios site is north of the optimum location)). Additionally, the record contains a PrimeCo generated Field Location Report recommending the "McGill site" over the Hellios site. (Hr'g Ex. 5, Field Location Report of Dec. 2, 1996 ("General Comments: Accepted as primary. Better that opt. 1 [the Hellios site] because of terrain + provides better cov. than 1.").) Although PrimeCo attempted to explain away the McGill Report, (*e.g.,* Tr. at 109–12 (Nourse thought that perhaps construction of nearby monopoles limited PrimeCo's earlier freedom to locate the Fox Lake monopole); Tr. at 153–56 (PrimeCo Acquisitions Manager Jennifer Hockensmith testified that developments arising after December 2, 1996, when the Report was written, and before February 14, 1997, when PrimeCo submitted its application, dictated a change in the Fox Lake search grid)), this too constitutes a conflict in the evidence; a decision left to the Village under our standard of review.

In any event, neither the Telecommunications Act nor Illinois law require a local zoning authority to permit construction of a cellular tower simply because the applicant has established the necessity of the proposed site. PrimeCo does not direct our attention to any statutory provision or caselaw mandating the issuance of a special-use permit under these circumstances; nor has our independent research revealed any such requirement. For these reasons, PrimeCo's argument regarding necessity fails.

### Conclusion

Once again in this opinion we have applied the standards of the poorly-drafted Telecommunications Act. In the Act, Congress sought to achieve some balance of interest between local communities' zoning concerns and the nation's interest in promoting modern communications. The Act did not, however, give telecommunication providers carte blanche authority over local zoning authorities. Given the complete record before this Court, we cannot conclude that the Village of Fox Lake violated the Act when it denied PrimeCo's permit application. Therefore, the Court hereby directs the Clerk of the Court to enter final judgment, pursuant to Federal Rule of Civil Procedure 58, in favor of the Village of Fox Lake.